IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARINA KARPENKO
a/k/a MARINA P. LEENDERTZ : CIVIL ACTION
:
      Petitioner :
vs. : NO. 09-03207
:
PAUL P. LEENDERTZ :
:
      Respondent :

MEMORANDUM OPINION AND ORDER

GOLDEN, J.                                                                                    MARCH 3, 2010

        Petitioner Maria Karpenko filed a Verified Petition for Return of Child to Petitioner after her daughter was removed from the Netherlands by Respondent on May 27, 2009. The Court held an evidentiary hearing on the Petition on September 22 and September 23, 2009. For the reasons that follow, the Petition is granted and the child will be ordered returned to the Netherlands, her country of habitual residence.

        Petitioner Maria Karpenko (the "Mother") and the Respondent, Paul Leendertz (the "Father") were married in Lehigh County, Pennsylvania on February 29, 2000. The Mother and the Father are the parents of Ekaterina Gerdina Pavlova Leendertz (the "child") who was born June 13, 2001 in Pennsylvania and is currently eight years old. The Mother and the Father separated in 2002 and were officially divorced in 2007.

        The Mother and the Father lived together as husband and wife with the minor child in the United States until September of 2002. In 2001, the Mother and Father began custody litigation in the Court of Common Pleas of Lehigh County, Pennsylvania (the "Pennsylvania Court"). On February 20, 2002, the Pennsylvania Court entered an Order awarding the Mother and the Father shared legal and physical custody of the child on a two-day rotation schedule, and requiring the Mother to surrender her passport to the Pennsylvania Court. Pet. Ex. 4.

By stipulation dated February 28, 2002, the Mother and the Father agreed, <u>inter alia</u>, that they would continue to share legal and physical custody of the child, that neither would remove the child from Lehigh Valley, Pennsylvania without the express permission of the other, and that the United States would be considered the child's "habitual residence" for a purpose of the Hague Convention. Pet. Ex. 5. This Stipulation was adopted by the Pennsylvania Court as a court order. <u>Id</u>.

On September 19, 2002, the parties entered into another stipulation in which they agreed, <u>inter alia</u>, to continue to share legal custody of the child; that the Mother would have primary physical custody of the child; that the Mother would be able to live outside the United States with the child, specifically in Kiev, Ukraine; that the Father would be permitted to visit with the child in the Ukraine, the Netherlands and/or the United States; and that the stipulation would "not be rendered null and void by operation of law in Holland or the Ukraine." Pet. Ex. 7. This Stipulation was also adopted by the Pennsylvania Court as a court order. <u>Id</u>. That court order additionally provided that "all previous custody orders are vacated." <u>Id</u>.

In September 2002, the Mother and the child left the United States and relocated temporarily in Krivoy Rog, Ukraine. In May of 2003, the Mother and the child permanently moved to Ede, Netherlands. In fact, the Father requested that the Mother and the child relocate to the Netherlands because the Father is Dutch, has family in the Netherlands, and, as a pilot, for Continental Airlines, would have less trouble seeing the child in the Netherlands. The Father testified, however, that this arrangement was only temporary and that the Mother and the Father agreed that the child would eventually return to the United States.

The Mother and the child have lived in Ede, Netherlands since May of 2003. The child has attended Dutch public schools since she was four years old. Dutch is her primary language. She also has numerous friends in Ede and socializes with the Mother's relatives.

During the six years the Mother and child have lived in the Netherlands, the Mother has failed to comply with numerous orders from the Pennsylvania Court concerning the Father's right

to visit the child in the Netherlands and in the United States. Prior to the removal of the child on May 27, 2009, the Father had not seen the child since September, 2006. After the Mother moved to a new address in Ede, Netherlands in 2007, the Mother did not disclose the address or phone number to the Father. In addition, the Mother has left many messages with the Father claiming that he will never see the child again and that if he tries to see her, the Mother will change the child's name and get her a new passport.

On February 28, 2008, the Mother filed a Request to Amend Custody and to Deny Access with the District Court of Arnhem in the Netherlands, seeking sole physical and legal custody of the child and also seeking to deny the Father any visitation rights. Pet. Ex. 13. On May 23, 2008, the Father filed a Petition for Modification of a Custody Order and Petition for Civil Contempt in the Pennsylvania Court, seeking sole physical and legal custody of the child. Pet. Ex. 12.

On October 28, 2008, the Pennsylvania Court granted the Father partial physical custody of the child for one week in the Netherlands between October 26 and November 30, 2008. Petitioner's Exhibit 19. On January 8, 2009, the Father filed another Petition for Contempt in the Pennsylvania Court, alleging that the Mother refused to allow the Father his visitation rights as ordered by the Pennsylvania Court in its Order of October 28, 2008. Pet. Ex. 20.

On February 20, 2009, the District Court of Arnhem stayed the Mother's Request to Amend Custody and to Deny Access, pending a decision on custody by the Pennsylvania Court. Pet. Ex. 21.

Following a trial on the Father's Petition for Contempt, the Pennsylvania Court issued an Order on May 20, 2009, which transferred sole legal and primary physical custody to the Father, and awarded visitation to the Mother "as she and the Father may agree." Pet. Ex. 23. The Order also provided the Father with the "sole authority to apply for and obtain a United States passport for the minor child without Mother's consent or authorization and without any further notice to Mother." Id. The May 20, 2009 Order allowed the Father to "obtain custody of the child at any place that she may

3

be found, whether in the United States or any other country" and that "[n]o further proceedings of any further orders shall be required for Father to obtain custody of the child." Finally, the Order stated that either the Father or his sister "shall be permitted to pick up the child at her school or any location to transfer custody to Father as specified herein." The Mother has appealed this Order to the Superior Court of Pennsylvania. That appeal is still pending.

The Father never registered the Pennsylvania Court's May 20, 2009 Order in any Court in the Netherlands. Instead, the Father made arrangements with an unknown third party to remove the child from her school without the consent of the Mother or the school. The Father testified that on May 27, 2009, he just happened to be walking past a school in Ede with the unknown third party when he suddenly spotted his daughter playing on the sidewalk. The Father testified that he picked up his daughter with the aid of the unknown third party, placed her in his car and then drove the child to Germany where they took a flight to Dubai and then to the United States. Within 30 minutes of the removal, an Amber Alert was issued in the Netherlands. Pet. Ex.24.

On May 29, 2009, the District Court for Arnhem entered an Interlocutory Order, stating, inter alia, that at the time of the removal, the Mother and Father had joint custody of the child under Dutch law; that the Father acted unlawfully in taking the child without the permission of the Mother and ordered the Father to immediately return the child to the Mother. Pet. Ex.26.

Since the removal, the child has been living with the Father and his new wife in Northampton, Pennsylvania. The Father has taken the child to see a licensed psychologist, Philip Nastasee, Ph.D. After seeing the child six times, Dr. Nastasee wrote a letter to the Father's counsel dated June 13, 2009, in which he stated that the child suffers from Acute Stress Disorder caused in part "from the rapid and unexpected transition." Resp. Ex. 4. The letter states that during monitored telephone conversations between the child and the Mother, the Mother has made "verbal promises to retrieve the child, veiled threats to punish the Father and multiple demands to have unlimited telephone contact with the child." Id.

The Court did not permit Dr. Nastasee to testify at the evidentiary hearing as an expert because Respondent's counsel had not submitted an expert report as required by Rule 26(a)(2)(A),(B) of the Federal Rules of Civil Procedure. N.T., September 23, 2009, at 103-105. As a fact witness, Dr. Nastasee testified that the child became agitated and highly suspicious after the phone conversations with her mother and that if the child was returned to the Netherlands she would become permanently alienated from her father. N.T., September 23, 2009 at 114-116.

The Court notes that both the Mother and the Father lacked credibility at times during the September 22-23, 2009 hearing. The Mother was not credible with regard to the Father's visitation rights with the child in the Netherlands, her obligation to follow orders from the Pennsylvania Court and the manner in which she applied for Dutch citizenship for the child. N.T., September 22, 2009, at 46-73. The Father was evasive, coy and less than forthcoming regarding the manner in which the child was seized from her school with the aid of a third party. N.T., September 23, 2009, at 54-57.

As an initial matter, the Court notes that the Father persists in arguing that the Court should abstain from deciding this matter under the Hague Convention because of the "parallel nature of the federal court and state proceedings." Respondent's Post-Trial Brief at 13. According to the Father, this Court "should defer to the decision of the state court regarding custody of the minor child." Id. at 14.

The Court already denied the Father's Motion for Abstention from the bench prior to the commencement of these proceedings on September 22, 2009. N.T., September 22, 2009 at 3-5. In short, the Third Circuit has clearly stated that abstention, whether it be based on Younger v. Harris, 401 U.S. 37 (1971) or on Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), is not appropriate where, as here, the Mother has not raised her Hague Convention claim in state court. The Third Circuit also stated that abstention is not appropriate because a Hague

Convention Petition and a custody determination are distinct issues, Yang v. Tsui, 416 F.2d 199, 205 (3d Cir. 2005). (Tsui I).

The Court now turns to the merits of the Hague Convention Petition. The Hague Convention is a multilateral treaty on parental kidnaping to which the United States and the Netherlands are signatories. See 53 Fed.Reg. 23843 (listing signatory nations). The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq., implements the Hague Convention and entitle a person whose child has been wrongfully removed to the United States to petition a federal court to order the child returned. See Yang v. Tsui, 499 F.3d 259, 270 (3d Cir. 2007) (Tsui II)("A person claiming that a child has been wrongfully removed to or retained in the United States can commence judicial proceedings under the Hague Convention by filing a petition for the return of child in a state or federal court which has jurisdiction where the child is located.")(citing 42 U.S.C. § 11603(b)). The Hague Convention reflects a universal concern about the harm done to children by parental kidnaping and a strong desire among the Contracting States to deter such behavior. Hague Convention, Preamble, 42 U.S.C. § 11601(a)(1)-(4). The Convention therefore has two main purposes: "to ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006)(citations omitted).

Consistent with these purposes, the Hague Convention's procedures are designed "to restore the status quo prior to any wrongful removal or retention and to deter parents from engaging in international forum shopping in custody cases." Baxter v. Baxter, 423 F.3d 363, 367 (3d Cir. 2005)(citing Feder, 63 F.3d 221). The Hague Convention is not designed to settle international custody disputes, but rather to ensure that cases are heard in the proper court. See Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.") id., art 16 (providing that "until it

has been determined that the child is not to be returned under the Convention," the state to which the child has been removed "shall not decide on the merits of rights of custody"); see also Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cit. 1993)("[A] United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.").

To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence that the "child has been wrongfully removed" within the meaning of the Convention. 42 U.S.C. § 11603(e)(1). A petitioner can establish that the removal of a child is "wrongful" if: "(1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of her home state, and (3) the petitioner had been exercising those rights at the time of the removal." Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007)(citation omitted); see also In re Application of Adan, 437 F.3d 381, 390 (3d Cir. 2006)(noting same). In sum, "the Hague Convention is designed to put all the participants in a custody dispute back into the positions they would have been but for one parent's wrongful removal of the child. It is not, and was never meant to be, a vehicle for determining custody rights." Carrascosa v. McGuire, 520 F.3d 249, 260 (3d Cir. 2008).

Upon a showing of wrongful removal, the burden shifts to the wrongful remover to establish one of several defenses. See Adan, 437 F.3d at 390. In accordance with the Hague Convention, a number of affirmative defenses may apply to prevent a wrongfully removed child from being returned. The respondent may defeat repatriation upon a showing, by a preponderance of the evidence, that: (1) although the proceedings have been commenced after the expiration of the period of one year from the date of the wrongful removal or retention, it is demonstrated that the child is now settled in his or her new environment; (2) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of the removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or (3) the child

objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of his or her own views. 42 U.S.C. § 11603(e)(2)(B); Hague Convention, arts. 12, 13, 13(a); Tsui II, 499 F.3d at 278. A respondent may also defeat repatriation upon a showing, by clear and convincing evidence, that (1) there is a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation; or (2) the return of the child would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. 42 U.S.C. § 11603(e)(2(A); Hague Convention, arts 13(b), 20; Bader, 484 F.3d at 668 (internal quotations omitted). The defenses are narrowly construed to further the aims of the Hague Convention. Tsui II, 499 F.3d at 271. Even if the court determines that a defense applies, it retains the discretion to order the child's return. Id.

As noted above, the first issue the Court must determine is where was the child's "habitual residence" as of May 27, 2009, the date she was removed to the United States. The term "habitual residence" is not defined anywhere in the Hague Convention. Feder, 63 F. 3d at 222. Our Court of Appeals has held, however, that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Id. at 224. "[A] determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." Id.

The child moved with the Mother to the Netherlands when she was only two years old. The child has lived in the Netherlands with the Mother for the past six years. At the time she was removed, the child was attending school in the Netherlands where she has numerous friends. Her primary language is Dutch and she was fully involved in all aspects of daily and cultural life in the Netherlands. There can be no doubt that the Netherlands, not the United States, is the place

where she has been physically present from the age of two until she was removed at the age of eight and which held a degree of settled purpose from the child's perspective.

The Father relies on the Stipulation of February 28, 2002 which provided, <u>inter alia</u>, that neither party would remove the child from Lehigh Valley, Pennsylvania without the express permission of the other, and that the United States would be considered the child's "habitual residence" as defined by the Hague Convention. Petitioner's Exhibit 5. Yet, on September 19, 2002, the parties filed another Stipulation in which they agreed, <u>inter alia</u>, that the Mother would have primary physical custody of the child; permitting the Mother to live outside the United States with the child; and providing for visitation for the Father with the child in the Ukraine, the Netherlands and/or the United States. The Court of Common Pleas of Lehigh County entered the September 19, 2002 Stipulation as an Order. This Order added that "all previous custody orders are vacated." Pet. Ex. 7. The practical effect of this Order was that the Stipulation of February 28, 2002 was vacated in its entirety, including the provision that the United States would be considered the child's "habitual residence." Pursuant to the September 19, 2002 Stipulation, the Father agreed that the Mother could live outside the United States with the child, including in the Netherlands. Therefore, the Court finds that, in the six years leading up to the day the child was removed, the Mother and the Father agreed that the child would reside with the Mother outside the United States. The Court finds that at the time of removal, the child's habitual residence was the Netherlands.

The next issue the Court must resolve is whether the Mother had rights of custody to the child at the time of the removal. Custody rights, under the Hague Convention, "include the rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." <u>Tsui</u> II, 499 F.3d at 275 (quoting Hague Convention, art. 5(a)). Although this Court is not empowered to determine who should have custody, a threshold determination of custody rights must be made. See <u>Adan</u>, 437 F.3d at 391-92. Right of custody is determined based upon the law of

the child's habitual residence. Id. at 391 (the country of origin's law determines whether the party seeking the child's return has custody rights in that country...at the time the child was [removed]).

Here, the Court has already determined that the child's habitual residence is the Netherlands. Therefore, the Court must determine whether the Mother had a right of custody to the child under Dutch law on May 27, 2009. Under Dutch law, custody means parental authority as well as guardianship. See Dutch Civil Code, Title 14, Article 245(2). Parental authority includes the duty and the right of the parent to care for and raise his or her minor child. Id. at Article 247(1). During a marriage, "parents exercise parental authority jointly." Id. at Article 251(1). "After dissolution of the marriage...or after a judicial separation, parents who exercised parental authority jointly shall continue to exercise such parental authority jointly unless the parents....request the court to provide that parental authority over a child...shall vest in only one of them...." Id. at Article 251(2). As no Dutch court had ruled at the time of the removal that parental authority over the child shall vest in solely the Father or the Mother, both parties shared joint parental authority or joint custody over the child. Indeed, even the Father's Dutch lawyer expert, Arlette van Maas de Bie, testified that on May 27, 2009, the Mother and the Father had joint rights of custody to the child under Dutch law. N.T., Sept. 23, 2009 at. 183-84,189.

The Father contends that the May 20, 2009 Order of the Pennsylvania Court granted him exclusive custody rights to the child, and allowed him to freely pick up the child in the Netherlands at any time, including at school. The problem with this argument is that as of May 27, 2009, the date of removal, the Father had not moved to have the Order of the Pennsylvania Court incorporated into a Dutch judgment in the Netherlands. A foreign order is not considered to be in effect in the Netherlands until it is recognized and enforced by a Dutch Court in accordance with the procedures set forth in Title 9 of the Dutch Civil Code. Dutch Civil Code, Title 9, Article 985, et seq. As of May 27, 2009, the date of removal, the Father had not registered the Order of the Pennsylvania Court in the Netherlands. Therefore, the May 20, 2009 Order was a nullity in the Netherlands.

Instead of going through proper protocol and registering the May 20, 2009 Order in the Netherlands, the Father resorted to the very type of extreme self-help remedy that the Hague Convention was specifically designed to forbid----a snatch and run.[1] The Court finds that the child's removal was in breach of the Mother's custody rights.[2]

Finally, the Court must determine whether the Mother was exercising her custody rights at the time of removal. The Mother's burden here is minimal. See Tsui II, 499 F.3d at 277 ("Essentially nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights.") The Mother can meet her burden of proof upon a showing that she kept, or attempted to keep, some sort of regular contact with the child. Id.

Here, the child lived with the Mother at the time of the removal. The Mother was actively involved in the child's daily life. The child frequently spent time with the Mother's relatives in the Netherlands. The Mother also pursued civil and criminal remedies almost immediately after the child was removed. The Mother simply did, and continues to do, everything possible to have her daughter returned. The third element is easily met.

---

[1] Ironically, in July, 2009, nearly two months after he had seized the child, the Father initiated proceedings to register and enforce the May 20, 2009 Order in the Netherlands. The Father claims he waited until July, 2009 because his "Dutch counsel needed sufficient time to compile the documents and prepare the case for litigation. Additionally, the Petition for Recognition of Foreign Court Judgment proceedings were delayed in the Netherlands because of a procedural error regarding which court had jurisdiction to hear the case." Respondent's Post Trial Brief at 30. Even assuming this to be true, as discussed above, under Dutch law, the Father had to wait until the May 20, 2009 was recognized by the Dutch courts before he could even begin to make proper arrangements to take custody of his daughter. Under no authority was the Father authorized to snatch the child from her school in the manner he did.

[2] The Father has also filed a Motion to Reopen the Record and for Consideration of After Acquired Evidence. Specifically, the Father refers to an Order dated November 11, 2009 from the District Court of Arnhem in which the Court stated with regard to its interim interlocutory judgment of May, 29, 2009 that: "It is clear that the mother commenced a repatriation procedure on June 2, 2009 with the United States District Court for the Eastern District of Pennsylvania. Given the fact that a decision is made in this procedure about the return of the minor, the preliminary relief judge believes that the mother has no longer status as an interested party in these proceedings. The mother's claims are therefore declared inadmissible." Exhibit 1 to Respondent's Motion to Reopen the Record. According to the Father, "[i]n declaring Petitioner's claims inadmissible, Holland has now determined that Petitioner did not have any rights of custody beginning on May 20, 2009, had no right to seek a return of the child to Holland, and that Holland would not require the child's return." Memorandum of Law Supporting Motion to Reopen at 4. Out of an abundance of caution and for the sake of completeness the Court will grant the Motion to Reopen. However, the November 11, 2009 Order does not help the Father. Giving the November 11, 2009 Order its plain meaning, the Court finds that the only reason the District Court of Arnhem declared the Mother's claims regarding the May 29, 2009 Petition to be inadmissible is because the Mother subsequently filed the present Petition for Return of Child under the Hague Convention with this Court. In essence, the Dutch court decided it no longer had to act on the May 29, 2009 Petition because the Petition sub judice would adequately address the relief the Mother sought. In any event, even without the May 29, 2009 Interlocutory Order, there is still ample evidence in the record, including testimony from the Father's own expert, that the Mother exercised joint custody over the child on May 27, 2009, the date of removal.

Accordingly, the Mother has shown that the Father wrongfully removed the child from the Netherlands, her country of habitual residence. The Court must therefore order the return of the child to the Netherlands unless the Father can establish one of the affirmative defenses. The only defense which even remotely could apply here is the "grave risk" defense which the Father must prove by clear and convincing evidence. Under the Hague Convention, a wrongful removal may nonetheless be justified if respondent can produce clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Adan, 437 F.3d at 390, 395. This "narrowly drawn" exception extends to situations in which a child faces a real risk of physical, sexual or psychological abuse upon return. Adan, 437 F.3d at 395. Based on the testimony at the evidentiary hearing, the Court simply finds that the Father has failed to establish by clear and convincing evidence that the child would face a real risk of any type of abuse if returned to the Netherlands. Dr. Nastasee's "concern" that the child would be permanently alienated from her father if returned to the Netherlands simply does not constitute clear and convincing evidence of the "grave risk" standard.

Based on the record before this Court, the Petition must be granted and the child must be returned to the care and custody of her mother so that she can return to the Netherlands.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARINA KARPENKO | : | |
| a/k/a MARINA P. LEENDERTZ | : | CIVIL ACTION |
| | : | |
| Petitioner | : | |
| vs. | : | NO. 09-03207 |
| | : | |
| PAUL P. LEENDERTZ | : | |
| | : | |
| Respondent | : | |

AND NOW, this 3rd day of March,, 2010, upon consideration of the Verified Petition for Return of Child to Petitioner and after an evidentiary hearing it is ORDERED that the Verified petition is GRANTED. IT IS FURTHER ORDERED as follows:

    1. The Motion of the Respondent to Reopen the Record [Doc. #55] is GRANTED.

    2. The minor child, Ekaterina Gerdina Pavlova Leendertz, shall be returned to the Netherlands in the company of the Petitioner Maria Karpenko within ten (10) days of the date of this Order or immediately upon the return of Ekaterina Gerdina Pavlova Leendertz to Petitioner Maria Karpenko. Maria Karpenko shall report the delivery of Ekaterina Gerdina Pavlova Leendertz to the appropriate authorities in the Netherlands.

    3. Petitioner Maria Karpenko has exclusive right to the physical and legal custody of Ekaterina Gerdina Pavlova Leendertz immediately and during the period of time required to return Ekaterina Gerdina Pavlova Leendertz to the Netherlands. This Order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention.

4. This Order is made under the authority of 42 U.S.C. § 11603(a), conferring upon this Court original and concurrent jurisdiction with federal district and state courts of the United States.

5. Any peace officer in the Commonwealth of Pennsylvania or any other federal officer shall enforce this Order allowing Maria Karpenko to remove Ekaterina Gerdina Pavlova Leendertz from the United States and allow Maria Karpenko to accompany her to the Netherlands, giving Maria Karpenko Gerdina Pavlova Leendertz the right, without interference, to have Ekaterina Gerdina Pavlova Leendertz in her lawful custody for the purposes described herein.

6. The Clerk is DIRECTED to mark this case closed for statistical purposes.

BY THE COURT:

*S/THOMAS M. GOLDEN*
THOMAS M. GOLDEN, J.